jbjb Please be seated everybody. Will the attorneys that are going to argue please step forward and spell your last name, state and spell your last name. Good afternoon, my name is Pamela Rubio, R-U-B-E-O, with the State Appellate Defender for Jamal Sox. Assistant State's Attorney Tyler Cox, C-O-X, on behalf of the people of the state of Illinois, I will be addressing a reasonable doubt argument as to this case. Good afternoon, your honors. Assistant State's Attorney Alan Spellberg, S-P-E-L-L-B-E-R-G, also on behalf of the people, and I'll be addressing the sentencing arguments. Okay, you know you each have 20 minutes, you don't have to use it all. Do you want to reserve some of yours? Just a few minutes for rebuttal please. Okay, thanks. And you know the microphones don't amplify, they just record, so try to keep your voice up, thanks. Good afternoon, may it please the court, this afternoon I'd like to focus on two of the issues contained in Jamal Sox's briefs. Those being the insufficiency of the state's evidence against Jamal at trial, and the improper imposition of Class X sentencing under the mandatory Class X sentencing statute. However, I'd be happy to answer any questions this court has about any of the issues. The state's case against Jamal Sox rested entirely on unreliable eyewitness identifications. Eyewitness identifications have been known to, under the most legitimate circumstances, have the potential to lead to misidentification and wrongful convictions. Here, the chronology of the investigation and the evolution of the witnesses' descriptions demonstrate just how unreliable the witnesses' identifications were. In this case, the robbery at issue occurred on December 19, 2014, and immediately after the crime, Melanie Jones gave a vague description to the police of three black male offenders. Officer Rubano testified at trial that Jones... We know the facts. Now, you say it's a dubious identification. At the beginning, what color did she say that the person she identified as Sox was wearing? She told the police officers on the day of the robbery that he was wearing a black hoodie and he had brown eyes. And then in that trial, she showed something completely different, did she not? Yes, she said at trial that he had striking green eyes, eyes that she could never forget, and that she had denied that she told the police that he had brown eyes and wore a black hoodie and said for certain that she had told the police that he had green eyes and wore a blue hoodie. And our position is that she became more certain of these facts that she testified to at trial and was certain of her perceptions of her memories of this incident that changed and developed as she was shown surveillance video footage from a previous day in which she saw Jamal enter the pharmacy. But it's also important that the officers themselves testified that she said black originally, and it was only at trial that she began to change the colors of the eyes and the... Well, no, she testified that she told the police. Right, but both police officers testified at trial. It was a conflict. Correct. And would you agree that that conflict is something that would be resolved by the trier effect? Yes, but the sufficiency of the argument, sufficiency of the evidence issue can always be presented to this court,  I understand, but the witness says I told the police one thing. The police said she told them another thing. It's for the trier effect to resolve whether that's important or not or whether it's significant or not, correct? Correct. And all that was brought to the trial judge's attention. Correct. But the trial judge got it wrong. There were two police officers who testified about a different description that Melanie Jones gave them when the memory of the actual incident was fresh in their brains. But what if the witness said I didn't tell the policeman that? Maybe the policeman got it wrong. But the police officer sent out a flash message that was consistent with what they testified to her having told them, that it was two offenders in black sweatshirts and one in a red sweatshirt, which is, if we're talking about a credibility battle, that corroborates the officer's testimony, that she said a black sweatshirt and brown eyes. And it makes sense, given the fact that she was shown this video repeatedly, that she at trial might be unreasonably certain that now the offender had green eyes, but there's no evidence to suggest that the state proved beyond a reasonable doubt that the same person entered on December 19th as they entered on December 18th. And Leanna Grace's testimony is even less reliable and less helpful in this analysis. She wasn't able to give the police a description at all and then never actually identified Jamal in a photo array or lineup. Well, and our position is, I'm sorry? Yes or no? She identified in court Jamal as the person that entered the pharmacy on the 18th, and then when pressed by the trial judge, she loosely said that it could have been the same person on the 19th. But on her own, she said that it was the person, that the person that she remembered with the green, beautiful eyes, was the person she saw on the 18th in the parking lot. And saw in court? Yes. And the court then is in the position of deciding whether that is credible testimony, worthwhile testimony, not worth it testimony. It's up to the trier of fact to decide how to factor that in, right? Well, and interestingly, the trial judge herself said that Leanna Grace's in-court identification was unreliable. So on the one hand, you agree with the judge in his credibility assessments and wait to be given to that testimony. But on the other hand, when it's unfavorable to the defendant, you think he was wrong, which again gets to the situation of it's up to the trier of fact to make the decision on what weight to give the testimony given all the consistencies and inconsistencies brought to his or her attention. And it's this court's obligation to review the evidence to ensure that the trial judge reached the right conclusion. We're saying that the judge didn't go far enough to finding the state's case against Jamal insufficient. Found Leanna Grace's identification insufficient, but should have made that final step to say, there's just not enough here. Other than her in-court identification of Jamal and the photo array identification, there's no other evidence connecting Jamal to the crime. Didn't he say that Grizz's identification alone wouldn't have been sufficient? It wasn't that he totally disregarded it. Isn't that the context that he put in? I believe he said something along the lines of, yes, in and of itself, it's unreliable because it was made under the least of ideal circumstances. Now, in viewing the video, Ms. Jones seemed to see them walk in the door, right, when she was standing at the counter, from the exterior door, I mean. And then she walked over to the interior door into the back there and let them in for whatever. Correct. So couldn't that have been enough of an opportunity for her to say, that's the guy that I saw the last three days? No, because in that video it's clear that the only thing that she could see, the offender in question had a hood down to his eyes and a mask up to his eyes, so the only identifiable physical characteristic of that person was his eyes, and she got it wrong. She told the police that his eyes were brown and his sweatshirt was black. And I do understand your argument, but I mean that wasn't the only physical characteristic. His body, his size and other things, she testified to. His leg build and his height and all of that stuff. But based on the 31 seconds that she had an opportunity to view something specific about the person wearing the clothing that entered the 19th, there's not enough evidence here to show that it was Jamal on the 19th who entered the store with the two other offenders. Unless the court felt she recognized him. I mean, how long do you have to look at somebody you already know? That is true, but her testimony and the police officer's testimony really doesn't support that. It supports a finding that her perceptions, although she might 100% believe that she saw a person with green eyes when she testified at trial, her perceptions were affected and, you know, improperly manipulated by the watching and re-watching of those surveillance videos. Let's look at what we have here. For purposes of this case, it's identification case. Correct. All right. So we have clothing. Is clothing alone sufficient? Clothing alone is insufficient to establish beyond a reasonable doubt the identity of the offender. That's been going on for many years. That's been going on. Correct. So we've got to go beyond. So what do we have beyond the clothing? Well, thin build. There's lots of people with thin build. That doesn't, to me, that's not a characteristic. Height, we don't know. He was tall, but to me, it's there. Right. Right. So the only thing we have other than that are the eyes color. Correct. Do you agree with that? Yes. So beyond those, beyond the eye color, is there anything else in the record that the judge could have found to say that this is the same, that this individual had, is the defendant? The person sitting is the robber. The person sitting in the courtroom is the robber. The judge relied mostly on the similarities of the clothing, actually. Okay. And so similarly to clothing, we just said, the Illinois law doesn't support. That's correct. Correct. The way the clothing was worn, but as I argued in the briefs, is a very common style of clothing to wear once pants hung low. So those were the factors that the court considered, that and the identification. Yes, so wearing pants low, there's cases about wearing pants low. Correct. It's a very popular fashion. Right. Again, we're talking about clothing and how it's worn. Right. And this brand, as I understand it, it's True Religion. True Religion, yes. Which is a very popular brand. It is. He was wearing different pants, if you're comparing the two. Okay. On the 18th, the person that Ms. Jones identified as Jamal was wearing army fatigue patterned pants. And then on the day of the robbery, the offender in question was wearing blue jeans. What about skin tone? Wasn't that another? I believe that they said that the skin tone was light. I mean, again, other than the skin surrounding his eyes and maybe some of his hand, you couldn't really get a good view of that. And I think that a skin tone description is a very subjective thing. What do we know in the record about the woman who came into the store with the individual on the 18th? I mean, she went up to the window. We see that. She's the one who asked the questions on the 18th. She asked some questions. It wasn't testified to what questions they were. They were about some sort of medication. And then just a few seconds later, they left. And do we know anything else about the visits of two prior days? We know that they didn't review the videos. They did not review the videos. Do we know anything else about those visits? We know that Jamal allegedly entered the pharmacy by himself and asked some questions about some medications. I don't know if they were the exact same questions. It's unclear. That's all we know from the 16th and 17th. They were not shown to Melanie Jones or Leanna Grizz, and they weren't presented at the trial. So we don't know what kind of clothes he was wearing. We just know he was alone. But he certainly wasn't with either of the other two offenders, and he was never connected to those two offenders or their getaway vehicle for which the police had a license plate. And drugs were never found that he allegedly took. Right. He had no proceeds on him. No DNA. No DNA, no fingerprints, no weapons recovered, no statements. He did not implicate himself. And the co-offenders, it's unclear to me if they were charged or not. I take that back. They were not charged. I'm not sure if they were arrested. The record is unclear about what happened with those two. But we do know that no implicating statements were admitted against Jamal from those two individuals. The state discusses the judge's description of the defendant's eyes. What's your reaction to that? I believe the judge, the way that I read the record, is that the judge was trying to fit Melanie Jones' change in description to a finding of guilt. I think the judge said something like, well, you can call him Brown, you can call him Hazel, but... Or Honey.  Honey sounds a lot different than Brown. It was defined by different people, different ways, so I think that's enough. But the witness's descriptions of those eyes is pretty telling. Both witnesses said those were striking green eyes, beautiful green eyes, eyes I would never forget. They didn't say that the eyes were brown.  I think the closest the judge got to describing him as brown was like a honey brown or something like that. Correct. But the judge did say, whatever color you call them, they are very noticeable. Correct. That's what he said. Right. So that's his observation of the defendant. They shine, so to speak, and they are a factor. They are a particular circumstance with respect to how the defendant looks that one would recall if in point of fact you happened to cross him, whether in a pharmacy or here in court, referring to the fact that he had unusual eyes, which the witness said. Right. He had unusual eyes. But if he has such unusual eyes on the day of the robbery... Was the judge allowed to make that observation in court? Sure, yes. Okay. It's a physical characteristic of the defendant. Right. But if they were so noticeable, then it wouldn't mean that the witnesses would most likely have told the police about those striking eyes on the day of the offense. Our position is that... Did the witnesses say they did not tell the police that? Leanna Grizz admitted she gave no description. And Melanie Jones denied that she told the police that the offender had brown eyes. But both officers said that she... One officer said that she described his eyes as brown. But neither officer said, oh, she told me right away these were unforgettable green eyes. They're particular and distinguishing.  Not to take all your time, but let me ask a question about it. The police department, based on the videos from a day or two earlier, right? Yes. They analyzed those videos and came up with a photo array. Correct. Correct? Ms. Jones did not pick out the pictures for the policemen to go search, right? They presented the photos back to the witness and asked the witness whether she could make an identification of any of the people in the photo array. And lo and behold, who did she identify? Jim Ong. Right. Now, I think it's fair to say that the videos from the earlier, previous days, you could not identify who that person was in the videos. You think on the 18th? Yeah. Well, they were able to do a... No, no, not they. We. Oh. If we looked at that video, we could not say that's you or me or anybody else. Correct. It took the police photo enhancement unit to develop those videos to come up with an array to present to a witness to see whether the suspect was in that array. Correct? Correct. So we have a photo identification by a witness or a victim of a robbery. In a normal circumstance, if this witness had been robbed and then 10 days later the police come with a photo array and she identifies this defendant and testifies as this witness did in court, that would be more than sufficient evidence to sustain a conviction if the trier of fact found their testimony credible. Well, most cases don't involve this set of circumstances where a witness is shown on, she admitted multiple occasions, a video of the defendant, presumably, on a different day. And then it's that video, because they couldn't use the 19th, that shows how useless the 19th video was. Looking at the earlier videos from the 18th, 17th, or 16th, you cannot identify who the person in the video is. Well, the software recognition program or the... But the witness would, right? I don't know if that did or not. She didn't say that's him, that's a thug or I can... Oh, right, she didn't know who Jim Olsatz was. But they came back later with five photographs or so, and she identified Mr. Olsatz. But isn't all that irrelevant? Because, first of all, we don't know, the record doesn't have much about this photo enhancement. Did the judge rely on it? In terms of... His decision. No, I mean, the judge relied on the in-court identification. So, with regard to the enhancement, the photo that was enhanced was of the day before. Correct. If it was of the day before, that's not a crime. That doesn't mean... Exactly. They take a photo yesterday, and they say, and she picks out the guy who was there yesterday. That doesn't mean that he's the same guy that's here today. Right. Isn't that what's going on here? So, yeah, maybe whether it's correct or not, we don't know. We don't know anything about the software. We don't know. There was no expert to testify. I mean, this is new technology that can be or might be okay. Maybe it's not. Maybe it is. So the judge, as I understood, did not rely on it, first. Second is it was taken of a different date. Right. And it's quite possible that he was there the day before. But that doesn't mean that's him the next day. And the question is, was that him on the 19th? Right. So what's that got to do with the other? I'm trying to figure that out. Well, I'll tell you in just a second. What it has to do with is the photo array did not contain an enhancement of the 18th's video. It contained a separate picture of the defendant that the police department figured out could be the suspect. Could be the person that entered the premise on the 18th. Exactly. And she identified the person in there as the person who stuck her up the day of the robbery. She didn't identify him, the photo array, as a picture of the person who was in there on the 18th from the video. It was a separate photo array. But her conclusion that it was the same person was cemented by the repeated viewing of the video and then the use of the photo array's picture that was derived from the video from the 18th. And so we're saying that her identification of him as the person that walked into the pharmacy on the 19th was unreliable. I know we've used up a lot of your time, but we're really out of time. So if you want to save a couple of minutes. Oh, okay. I would like to address the sentencing argument, I suppose, in rebuttal then. You want to do it quickly? Yeah, do it quickly. It'll just take a few moments. I would like to just focus today on the first part of the issue relating to the use of the mandatory classic sentencing statute in that the statute was inapplicable to Jamal because one of his prior offenses used as a predicate offense was actually committed when he was 17, and the Juvenile Court Act had been amended after that, but before the commission of the alleged robbery in this case. And so it was not now, quote, unquote, now classified as a Class II or greater offense for purposes of the trigger of the mandatory classic sentencing statute. And the appellate court has recently considered this exact argument in People v. Miles and reached the conclusion that I'm asking this court to reach, that the defendant in that case, his prior, I believe it was an armed robbery that he committed when he was 16, could not be used as a triggering offense for mandatory classic sentencing purposes. And for the reasons set forth in Miles and in Jamal's briefs, we asked this court to, I know in the briefs I had asked for a remand for resentencing, but since so much time has passed and since Jamal has served more than what he would have served if he were sentenced to the maximum Class II range of seven years, we're just asking this court to reduce his sentence to seven years for the reasons stated in the briefs. Great, thanks. Thank you. May it please the Court, Assistant State's Attorney Tyler Cox on behalf of the people of the State of Illinois asking this court to affirm the defendant's convictions and sentence for robbery. In this case, the people proved the defendant guilty of robbery beyond a reasonable doubt based on more than just an eyewitness identification, as the defendant now argues. The people proved the defendant guilty of this robbery via the testimony of Ms. Jones as well as the video from the 18th and 19th and also the… Wait, what does, how does that video prove anything? The video which the court observed, the court acknowledged it was the defendant in both the video from the 18th as well as the 19th. So the judge said it was the same person? He did, yes. And we can look at that video too? Yes. And we could come out to a different conclusion, couldn't we? In theory, yes, however… Well, not in theory. I mean, we could. I mean, it's the same evidence. Yes. However, viewing the light most favorable to the people, it's the standard, obviously, on a reasonable doubt issue. We put great weight in the circuit court's determination that this was the same individual in both the 18th and 19th. And it was based upon the clothing? Based upon the clothing, based upon the stature, based upon the… Wait, wait, stature. What evidence do we have about thin build? Correct. Anything else? The height of the defendant. How high? Similar heights in both the, both videos. How can you tell? Where was the evidence that there was similar height in both videos? The video itself. It's here to herself. So you're just saying, looking at the videos, you can tell that it's the same height? Correct. But there was no testimony as to how tall the individual was on the 18th and how tall the individual was on the 19th? No, there was no specific testimony as to how tall both the individuals were. How does that prove that's the same person? People can be, you know, whatever that is, I don't know, height. How does that help? Because all the factors combined, the stature, the clothing… How does stature, does the judge rely on stature? There was a description of the stature. There was a description, but does the judge rely on stature? I believe he does. At least he says that it's the same sweatshirt with the same pants. Wait, wait, wait. I didn't talk about sweatshirt. I talked about stature. I don't know if he specifically addresses the stature. Okay, so let's go on. So you mentioned sweatshirt. Yes. She testified, the best testimony we have is from, is that the sweatshirt from Jones is black. We have other testimonies, black. And all of a sudden at trial, it's blue. Correct, yes. What color is it in the video? It's a darker color. You can't tell what color, can you? Specifically, I would not be able to tell exactly. But you can specifically see the significant markings on the sweatshirt. So what? The trial judge put great weight in those significant markings, being able to say this was the same sweatshirt, this was the same individual. So your unique sweatshirt? It's not a one-of-a-kind, no, but it is a distinct marking on the sweatshirt. It's a marking. And nobody wears that kind of, true religion is one of the big brands, isn't it? I am sure it is, yes. And hasn't the Illinois Supreme Court and other courts in Illinois said that clothing alone isn't sufficient? They have already. We don't have just clothing alone in this case. Okay, so we'll put the clothing away. Now, what do we have left? You also have the way he's wearing the pants. We also have the eyes. Oh, wearing the pants. Hasn't cases around the country said that wearing baggy pants is fine? Yes, again, alone. But is it not just one person? How many people in this city wear baggy pants? Quite a few, I would imagine. Okay. And somebody who might be wearing a true religion shirt could also wear baggy pants. Does that make somebody guilty? No, it does not. However, that's not all the evidence that was in this case. It's not the all the evidence. But technically, a baggy pants, again, we're talking about clothing. Of course, clothing is not enough. Correct. Okay, so let's put that to the side. I mean, it's clothing. People wear baggy pants and wear true religion. Would it make sense if you're wearing a sweatshirt with true religion? As likely or not, you could be wearing baggy pants? It's a possibility, yes. And the pants were different, weren't they? The pants they were wearing on the 18th and the pants they were wearing on the 19th? They were different, yes. They were more in the same style, but they were different. They were different. Okay, so we don't have the same pants. So how does a judge rely on the pants? Just the way he was wearing them. Again, it's a matter of totality. The courts have said that that's not sufficient. Yes. So what are we left with? From the video, that's essentially what the judge connected the two with. However, there's more than just the video that proved the defendant guilty in this case. There was also the testimony of Ms. Jones. There was also the testimony of Ms. Gris. But what was the testimony of Ms. Jones that you say is an addition? The eyes? The eyes, correct. And the fact that she was familiar with this defendant from seeing him the three days prior to the robbery. Well, how do we know that it was the same defendant? Because that was her testimony. Well, then we have to go through the bigger factors, don't we? Correct, correct. So go through the bigger factors and tell me how do they fall? Absolutely. The first factor, the opportunity to observe the defendant. How many seconds did she have to observe? I don't know the specific time. However, she was able to observe the defendant as he walked in, as he stood at the door before she let them in. And she was also familiar with this defendant. How could she have seen him through the door? When she let the defendant in the door. When he entered. Correct. And somebody had a gun in her face. Is that right? Someone did have a gun, yes. Right in her face, as soon as they entered. Correct, there was a gun. And she was put to the side. Somebody had a gun on her. Yes, yes. Right. So split seconds. Correct. However, she was familiar with this defendant. How do you know? The only thing showing were a little slip for his eyes. Correct. And those were the distinct eyes that I believe Your Honor pointed out that the court remarked on. There was a distinct eyes. Both witnesses, as well as the judge, commented on the distinctness of these eyes, as well as the skin of the complexion. Well, the complexion, I mean, people have different complexion. I don't see how complexion. I mean, she testified brown-eyed, brown-eyed, brown-eyed. And all of a sudden at trial, or not just when she's saying brown-eyed, brown-eyed, at trial, they're a different color. Correct. And the shirt's a different color. I mean, things are changing colors here. Correct. And any conflict in the testimony is properly resolved by the trier of fact. And that's exactly what the circuit court did in this case. Viewing the evidence in the light most favorable to the people, all that evidence was properly weighed in favor of finding the defendant guilty. And you can see when you're this close case. It was a relatively close case. Yes, it was not. But viewing the evidence in the light most favorable to the people, there was overwhelming evidence of the defendant's guilt. There was. Where's the overwhelming evidence? Again, there was the video from the – The day before video, that doesn't show that that was the man that came in on the 19th. Around, no. But all we know is the picture that they took was able to maybe identify who was there on the 18th. That doesn't mean that that person was there on the 19th. That is – those are different days. And the picture was of the man who was there on the 18th. Maybe she saw him. Well, the person on the 19th had a mask on, and all you could see was just a little sliver of his eyes. We don't know exactly how much, but yes. Well, we do. Don't we? Yes. I stopped it, and you could see how much – he's got his hoodie on very tight, right? Yes, correct. And he's got a mask from his nose, right, starts at his nose, goes down to his mouth. Correct. And the hood goes down to over his eyebrow? Yep. Approximately? Absolutely, yeah. But again, that's not the only thing that was the evidence of the defendant's guilt in this case. It was the testimony of Bruce Jones who had seen him the three previous days. Yes. You keep saying that. Whether this person was there three previous days or not, we don't know. But you may identify a person who was there three days for the previous few days. That doesn't mean that this man is that man. The only thing that you're saying is her testimony that she believes that this is the same fellow? Yes. And in viewing the evidence – Just based on his eyes. Is that all I got? That's what she testified to, yes. And it's – but she even mentioned stature as well as other factors. And viewing that evidence in the light most favorable to the people, the circuit court probably considered that as evidence of this defendant's guilt. How was her opportunity of view? I mean, again, we don't know how long she viewed him on the 16th, do we? No, we do not. 17th? Not specifically. He asked a question. No, we do not know. Correct. 18th? A few seconds? He was in the store, yes, for a few seconds. A few seconds. Correct. The woman was before the counter and he was kind of in the back. Correct. But she did testify. She was able to observe him. A few seconds? Yes. And split seconds on the 19th? A few seconds, yes. You know, is there any case law or anything on the biggers factors when you recognize somebody? Typically, I don't know any case law off the top of my head. I know that usually the biggers factors aren't typically when you recognize. If I saw Judge Pierce for one second, maybe I wouldn't have all of the biggers factors, but I know where he is. Correct, yeah. But usually the biggers factors are not employed when somebody recognizes somebody or someone. Now, what about the fact, do you think that the witness could have been influenced by watching those videos from the previous day? Well, the only reason the police officers were aware of the videos from the previous day was because Ms. Jones had told them that this defendant was in the store the day before. This guy that robbed me was in the store the day before. So that's how they pulled the video in the first place. So while she didn't view the video, obviously, before trial, she had already given a description. She had already identified this individual as the same individual from the day before to the police officers, and that's how they found the video in the first place. So it's not likely that she was typically influenced by this video. Well, I could ask the same question that Justice Pierce was asking about the fact that before trial she's saying brown eyes and black shirt, and at trial she's saying something else. The farm sale. Finally, not only the video, not only the testimony of Ms. Jones, but also the corroborative testimony of Ms. Grizz was also evidence of this defendant's guilt. While it's true the circuit court said that standing alone, her identification of this defendant in court would not be enough, obviously, to convict him, her testimony went beyond just an identification in court. It also corroborated the events of the robbery on the 19th. Which has nothing to do with identification. No, it does corroborate Ms. Jones' testimony. She was on identification. Well, she saw the video, too. She was down on the farm most of the time. Correct, correct. She said very scared. Correct, absolutely. You remembered correctly her words. Yes, she was very scared. And the circuit court even distinguished between Ms. Grizz, who was scared, and Ms. Jones, who by all accounts was not scared, was able to pay attention to what she was seeing. But it did corroborate Ms. Jones' version of the events. Ms. Grizz also saw this defendant leaving the store. She was unequivocal about that the day before, the 18th. So it also corroborates not only the video of the defendant in the store, but also Ms. Jones' testimony that it was the defendant in the store the day prior. If there are no further questions about the reasonable doubt argument, Mr. Spelberg will be addressing the sentencing issue. Okay. Thank you. Good afternoon again, Your Honors. The defendant here was properly sentenced as a Class X offender, as the current conviction was his third Class 2. What's your response to Peeble v. Miles? Your Honor, Peeble v. Miles is wrongly decided in our estimation. We have a pending petition for re-hearing. After counsel filed a motion to set additional authority to cite the Miles case, we attempted to file additional authority to explain our petition in the Miles case. That motion to set additional authority was denied, so I won't be mentioning those cases today. But it is still our position that Miles was wrongly decided based upon the arguments that we make in our brief here. And the key to the question in this case is whether the defendant had two prior convictions, two prior convictions for Class 2 or greater offenses. And it's undisputed that he has two prior convictions for Class 2 or greater offenses because he was convicted in 2011 of a burglary and he was convicted in 2012 of a robbery. Both those are Class 2 offenses. They are classified as Class 2. They have always been classified as Class 2, both at the time of those offenses, the time he committed the incident offense, and the time he was sentenced for this offense. But the statute, 5-4.5-95B, says an offense now classified in Illinois as a Class 2 or greater class of Illinois required this result because the defendant's 2000. So it's different today because he was tried as an adult. Your Honor, I respectfully disagree. It is not different today. Burglary is still classified as a Class 2 offense. But he was tried as an adult. He was tried as an adult because at the time they sentenced him. At the time, okay. But, Your Honor, the plain language of the statute of Section 5-4.5-95B makes it clear that you look to see the elements of the offense, the classification of the offense, the statutory designation of the offense, not whether or not that particular defendant would be prosecuted in the same manner today as opposed to yesterday. Because essentially what counsel's argument is, what the Miles decision was, is that the decision to change the age of juvenile court jurisdiction, raising it from 17 to 18, became effective January 1, 2014. Effectively, that is to apply it retroactively, to go backwards and take a conviction that was entered by a court pursuant to lawful jurisdiction according to the applicable statutes at the time, a conviction that was properly entered, and to now recast it as a juvenile adjudication. And that's not correct. Because it was a conviction that was entered pursuant to the law. But that's the issue. Yes. You just stated the issue. Yes. It's both the issue and our position. Yeah, right. And our position is that a conviction once entered, when it is entered as a criminal conviction, a person is prosecuted as an adult under the law as applicable at the time, is a conviction for purposes of criminal history. And it continues on for purposes of criminal history. It isn't recast into a juvenile adjudication. Now, it's possible, of course, that a judge, when imposing a sentence, can consider the defendant's age at the time of the earlier convictions as a factor in mitigation. But it doesn't alter the fact that it is a criminal conviction. It's defined as a conviction under the statutes. It fits all the definitions of a conviction. It is not a juvenile adjudication. And yet the Miles case views it as if it were a juvenile adjudication. It treats it as, well, because he was 17 years old at the time of the crime in that case, then he would be prosecuted today in a different manner. And so we're going to give credence to the manner in which we prosecute it today instead of the way it was done according to the law at the time that it occurred. And that's just inconsistent with really the notions of how we look at prior adjudications, prior convictions. Thank you.     And I would like to ask a question. I'm not aware of any other case you would cite us to. Pardon? Is there a case you would cite us to? Well, I'm going to disadvantage your honor because, again, we did seek to cite additional authority, and it was denied, and I don't want to put counsel at a disadvantage in that regard. Well, I would suggest that we allow you to cite the additional authority and give counsel an opportunity to respond to it. Because what's the status of the petition for re-hearing? Our petition for re-hearing in the Cante Malis is still pending. Petition for re-hearing? Petition for re-hearing is still pending. How long has it been pending? We filed it about three weeks after the decision came out, so it's been about a month. And as long as it's denied, you'll take it PLA? I imagine that will be the case. I can't make any guarantees in that regard at this point. Let me ask you a question on this Class X issue of Section 5-4.595B. It says the first felony had to be committed after 1978. The second felony committed after the conviction in the first felony. Yes. And then the second felony committed after conviction of the second. Here, the two predicate felonies, the sentencing occurred on the same date, one for violation of probation and the second one for the second offense. Yes. The second offense was committed before the conviction on the second one because it was a BOP, which is a new conviction, right? Your Honor, I would respectfully disagree with that because the initial probation, I believe it was Boot Camp that the defendant was sentenced to, once that imposition of the probation in Boot Camp, there was a conviction entered for that 2011 burglary. The imposition of the sentence for the probation constituted the final conviction that occurred. Now, obviously, the defendant then thereafter violated his probation and he was resentenced, but it didn't change the actual date of conviction for purposes of this scenario because he committed an offense, was convicted. He then committed a separate offense and was convicted. And, yes, the separate offense is what resulted in. But doesn't the subsequent sentencing and the violation of probation constitute the date of the conviction? Your Honor, it constitutes the date of the conviction for that conviction, but I don't believe that it constitutes the ultimate date of conviction for purposes of this because he was convicted as of that date of the imposition of the violation of probation. There's no question about that, but if you consider a violation of probation to be essentially a resentencing on the original conviction, then his date of conviction would be the date he was sentenced on the violation of probation. I mean, that to me seems, at least under the rule of lenity, a better argument for the defendant because he was the second offense was committed long before he was sentenced on the first offense. Your Honor, I understand your point. And I believe the case law says that the rule of lenity doesn't factor in that regard because the conviction was entered at the time of the probation. I understand your point. Again, I will go back and look at the case law, and if necessary, I may ask Lee to seek additional authority for that point as well. But again, just very briefly, it is our position that once a conviction which is lawfully entered upon a person who is under age 18 at the time is lawfully entered as a conviction, it continues to be a conviction throughout purposes for the criminal history. It's our position the Miles case is wrongly decided. We will seek, again, to cite the additional authority that we offered before on that point. Thank you, Your Honor. Do you have any objection to that additional authority? Yeah, we'll do that then. You can cite the additional authority, and then how much time do you have? Well, I did file a response to their motion to cite additional authority, because of course you have. But if you'd like, sir. No, no, if you're fine with that, that's fine. Well, if I may suggest, if Mr. Spelberg files something, 21 days okay for you? That's fine. Okay. We'll just consider that, of course. Okay. Thank you, Your Honor. Thanks. I just have a few points. With respect to the reasonable doubt argument, in answer, I believe, Justice Griffin, you asked whether there was any case law on prior acquaintances and how that would affect someone's identification. I would just like to inform you of People v. Lerma. It's in the defendant's opening brief, and it discusses how a person's prior acquaintance with an individual could affect his or her perception and reconstruction of memory. So I ask this Court to consider Lerma when considering the reasonable doubt argument. In terms of the sentencing, the sentencing issues, the state is arguing that the key is whether a person has two prior Class II or greater felonies in their background. The plain language of the statute is that it's not just about whether this person has two prior Class IIs in their background, but the relevant issue is whether those prior Class II or greater felonies are now classified, those prior offenses are now classified as prior Class II or greater felonies. The legislature explicitly put that requirement in the language of the Mandatory Class Act Sentencing Statute. And those two questions, whether someone has a prior offense that was entered as an adult conviction and whether it can be used as a triggering offense for Mandatory Class Act sentencing purposes, are two different questions. We're saying that regardless of what this Court calls Jamal's prior 2011 burglary conviction, whether it is a Class II adult conviction, we're not asking the Court to change the naming of that. What we're saying is that it did not qualify him for Mandatory Class Act sentencing at the end of 2014 when this crime allegedly occurred. And if you look at the state says that you should look to the elements of the offense, but if you look to the elements of the offense, that's exactly what we have. We have a commission of a burglary by someone 17 years old would not, at the end of January 2014, be classified as a Class II or greater. And for those reasons, we ask the Court to change it. Is that because under the Juvenile Court Act, we don't have classes? Right. It would be a juvenile adjudication. You're saying because he was 17 at the time of that offense, when they changed the statute, he would not have been in the criminal courts. He would have remained in the Juvenile Court. They would not have transferred him. Well, his case in this particular case was unlike Miles. It wasn't a transfer case. At the time, the Juvenile Court Act had exclusive jurisdiction over defendants under the age of 17, and then it was amended to 18. So when he was 17, when he was charged for burglary in 2011, it was automatically – it was charged as an adult offense. But in 2014, at the end of 2014, when this crime allegedly occurred, it would not have been able to be charged as an adult offense because he was 17 years old and the Juvenile Court had exclusive jurisdiction over him at the time. Did you heard? Yes. Right. And our position is supported by a – just this month, the Senate introduced a new Senate bill asking that this very statute be amended so that all of the predicates had to have been committed by someone the age of 21 and over. So this supports our position that the legislature never intended to have prior juvenile adjudications considered for mandatory class act sentencing purposes. And for all of those reasons and those contained in our briefs, we ask this court to reverse Jamal's conviction or alternatively reduce his sentence. All right. Thank you very much. And I appreciate all the work. Good job. And we'll review your filings and issue a ruling. Thank you.